## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ANGELICA C., et al., | Case No. 20-cv-913 (NEB/ECW) |
| Petitioners, | |
| v. | **REPORT AND RECOMMENDATION** |
| IMMIGRATION AND CUSTOMS ENFORCEMENT; PETER BERG, Head of Immigration and Customs Enforcement; and WILLIAM BARR, United States Attorney General, | |
| Respondents. | |

This matter is before the Court on Petitioners' Motion for Declaratory and Injunctive relief (Dkt. 4) ("Motion"). Petitioners move pursuant to Federal Rule of Civil Procedure 65(a) and (b) for a temporary restraining order ("TRO") or for a preliminary injunction requiring Respondents to release Petitioners from their present detention on bond at either Kandiyohi County Jail or Sherburne County Jail or that the Court conduct a bail hearing. The case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

Briefing was complete on the Motion on May 5, 2020. (*See* Dkts. 6, 14, 25, 31; *see also* Dkts. 11, 29 (establishing briefing schedule).) At the request of the parties, the Court held a status call on May 7, 2020, and ordered the parties to file a joint status report two business days after U.S. District Judge Nancy E. Brasel issued an order on then-pending objections in *Mohammed S. v. Immigration and Customs Enforcement*, Case No.

20-cv-793 (NEB/ECW) (D. Minn.), another case in which immigration detainees sought release from Sherburne County Jail based on COVID-19 concerns. (Dkt. 39.) In *Mohammed S.*, the undersigned recommended denial of the petitioners' motion for preliminary injunction. *Mohammed S. v. Tritten*, No. 20-CV-793 (NEB/ECW), 2020 WL 2750836, at *3 (D. Minn. Apr. 28, 2020). On May 14, 2020, Judge Brasel issued an order in *Mohammed S.* adopting the undersigned's recommendation that the petitioners' motion for preliminary injunction be denied. *Mohammed S. v. Tritten*, No. 20-CV-783 (NEB/ECW), WL 2488088 (D. Minn. May 14, 2020), *amended and superseded by* 2020 WL 2750109 (D. Minn. May 27, 2020). The parties filed their joint status report asking to end all briefing in this matter and to submit Petitioners' motion for injunction relief on the papers with no oral argument. (Dkt. 40.) The Court issued an order stating it would decide the Motion on the papers. (Dkt. 41.) For the reasons discussed below, the Court recommends that the Motion be denied without prejudice.

## I.   BACKGROUND

### A.   The COVID-19 Pandemic

COVID-19 is the disease caused by the novel coronavirus SARS-CoV-2. *See* Ctrs. for Disease Control & Prevention, *Infection Control Guidance* (last visited June 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html. COVID-19 has become a global pandemic and around the time Petitioners initially filed this action Minnesota had 1,809 confirmed cases of COVID-19 and 87 deaths. *See* MN Dept. of Health, *Situation Update for Coronavirus Disease 2019 (COVID-19)*, (last visited April 15, 2019), https://www.health.state.mn.us/diseases/

2

coronavirus/situation.html. As of the date of this Report and Recommendation, there are 26,980 confirmed positive cases with 1,148 deaths in Minnesota; Sherburne County has 249 confirmed cases with 2 deaths; and Kandiyohi County has 514 confirmed cases with 1 death. *See* MN Dept. of Health, *Situation Update for Coronavirus Disease 2019 (COVID-19)*, (last visited June 5, 2020), https://www.health.state.mn.us/diseases/ coronavirus/situation.html.

There is currently no vaccine for prevention of COVID-19 infections. *See* Ctrs. for Disease Control & Prevention, *Protect Yourself* (last visited June 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html. In addition, the CDC has represented that there "is no specific antiviral treatment recommended for COVID-19." *Id.*, *What to do if you are Sick*, (last visited June 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when sick.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov %2Fcoronavirus%2F2019-ncov%2Fabout%2Fsteps-when-sick.html.

According to The Centers for Disease Control and Prevention ("the CDC"), individuals with the following conditions or living in the following circumstances are at high risk for severe illness from COVID-19:

- People 65 years and older;

- People who live in a nursing home or long-term care facility;

- People of all ages with underlying medical conditions, particularly if not well controlled, including:

    o People with chronic lung disease or moderate to severe asthma;

- o People who have serious heart conditions;

- o People who are immunocompromised, where many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications;

- o People with severe obesity (body mass index ("BMI") of 40 or higher);

- o People with diabetes;

- o People with chronic kidney disease undergoing dialysis; and

- o People with liver disease.

*See* Ctrs. for Disease Control & Prevention, *People Who Are at Higher Risk for Severe Illness* (last visited June 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

COVID-19 is transmitted person-to-person by respiratory droplets or by touching contaminated surfaces. *See* Ctrs. for Disease Control & Prevention, *Infection Control Guidance* (last visited June 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html. One of the major challenges in stopping the spread of COVID-19 is that people with no symptoms can spread the virus to others. (*Id.*) Indeed, Respondents, relying on the CDC, acknowledges that "[t]here is also evidence of asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms." U.S. Imm., and Customs Enforc. ERO *COVID-19 Pandemic Response Requirements* (Version 1.0, April 10, 2020), (last visited June 5, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf. The CDC has recommended

that "[m]aintaining good social distance (about 6 feet) is very important in preventing the spread of COVID-19." *See* Ctrs. for Disease Control & Prevention, *How COVID-19 Spreads,* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 5, 2020).

**B.    ICE**

There have been 818 confirmed cases of COVID-19 among those currently in ICE custody throughout the United States. *See* U.S. Imm., and Customs Enforc., *ICE Guidance on COVID-19* (last visited June 5, 2020), https://www.ice.gov/ coronavirus.

The CDC has recognized that because detention centers integrate custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting, they present unique challenges for the control of COVID-19. *See* Ctrs. for Disease Control & Prevention, *Guidance for Correctional & Detention Facilities* (last visited June 5, 2020) (https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html).  With respect to preventing the introduction and spread of COVID-19 in detention facilities, the CDC recommends that a number of steps be taken at such facilities including: restricting or suspending the transfers of detained persons and to subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate; quarantining all new inmates for 14 days before they enter into the general population; cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; increasing the number of staff or detained persons trained and responsible for cleaning the common areas to ensure cleaning of the

areas throughout the day; providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; implementing social distancing strategies to increase the physical space between each detained person, ideally 6 feet between all individuals, which should include staggering meal and recreation times, and reassigning for bunking; and medically isolating confirmed or suspected COVID-19 cases.[1]  (*Id.*) With respect to staff, the CDC recommends that staff stay home if they are sick and perform daily temperature checks for staff.  (*Id.*)

In addition, ICE's Enforcement and Removal Operations ("ERO") has issued COVID-19 Pandemic Response Requirements, which requires non-dedicated ICE detention facilities to comply with the CDC's interim guidance.  *See* U.S. Imm., and Customs Enforc. ERO *COVID-19 Pandemic Response Requirements* (Version 1.0, April 10, 2020), (last visited June 5, 2020), https://www.ice.gov/doclib/coronavirus/ eroCOVID19responseReqsCleanFacilities.pdf.  ERO requirements also provide that cloth face coverings should be worn by detainees and staff.  (*Id.*)  Similar to CDC guidelines, detention facilities are to provide detainees and staff with no-cost, unlimited access to supplies for hand cleansing, including liquid soap, running water, hand drying

---

[1]    The CDC explains the difference between a "confirmed" and "suspected" case of COVID-19 as follows: "Confirmed vs. Suspected COVID-19 case—A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms.  A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results.  If test results are positive, a suspected case becomes a confirmed case."  *See* Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (last visited June 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

machines or disposable paper towels, and no-touch trash receptacles.  (*Id.*)  Screening

should take place before staff and new intakes enter the facility (or just inside the

facility), including visual and temperature checks.  (*Id.*)  As it relates to social

distancing, ERO recommends efforts at reducing facility population to 75% of capacity,

housing detainees in individual rooms to the extent possible, staggering access to

recreation and mealtimes, avoiding congregating in groups of ten or more, and

maintaining a distance of six feet.  (*Id.*)

In March 2020, ERO convened a working group between medical professionals,

disease control specialists, detention experts, and field operators to identify additional

enhanced steps to minimize the spread of the virus.  (*Id.*)  ICE has "since evaluated its

detained population based upon the CDC's guidance for people who might be at higher

risk for severe illness as a result of COVID-19 to determine whether continued detention

was appropriate."  (*Id.*)  Based on this, ICE has taken the following actions:

> ICE has released nearly 700 individuals after evaluating their immigration
> history, criminal record, potential threat to public safety, flight risk, and
> national security concerns.  This same methodology is currently being
> applied to other potentially vulnerable populations currently in custody
> and while making custody determinations for all new arrests.
> Additionally, ERO has limited the intake of new detainees being
> introduced into the ICE detention system.  ICE's detained population has
> dropped by more than 4,000 individuals since March 1, 2020 with a more
> than 60 percent decrease in book-ins when compared to this time last year.

(*Id.*)

On April 4, 2020, the ERO issued updated internal guidance with respect to

reviewing the detention of individuals in light of the COVID-19 pandemic.  (Dkt. 33-1.)

The guidance included the following:

The Centers for Disease Control and Prevention (CDC) has developed a list of categories of individuals identified as potentially being at higher-risk for serious illness from COVID-19. Expanding on that list, ERO has identified the following categories of cases that should be reviewed to re-assess custody:

- Pregnant detainees or those having delivered in the last two weeks

- Detainees over 60 years old

- Detainees of any age having chronic illnesses which would make them immune-compromised, including but not limited to:

  o Blood Disorders

  o Chronic Kidney Disease

  o Compromised immune system (e.g., ongoing treatment such as chemotherapy or radiation, received an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications)

  o Endocrine disorders

  o Metabolic disorders

  o Heart disease

  o Lung Disease

  o Neurological and neurologic and neurodevelopment conditions.

* * *

After identifying a case as meeting any of the above criteria, you should review the case to determine whether continued detention remains appropriate in light of the COVID-19 pandemic.

The presence of one of the factors listed above should be considered a significant discretionary factor weighing in favor of release. To be clear, however, it may not always be determinative. Field offices must remain cognizant of the requirements of mandatory detention. Section 236(c) of the Immigration and Nationality Act (INA) mandates the detention of certain categories of criminal and terrorist aliens during the pendency of removal

proceedings.  Such aliens may not be released in the exercise of discretion during the pendency of removal proceedings even if potentially higher-risk for serious illness from COVID-19.  INA § 236(c); 8 C.F.R. § 236.1(c)(1)(i). Such aliens may only be released following a final order issued by an immigration judge, the Board of Immigration Appeals, or a federal court granting the alien relief, dismissing proceedings, or terminating proceedings. Similarly, pursuant to section 241(a)(2), certain criminal and terrorist aliens subject to a final order of removal may not be released during the 90-day removal period even if potentially higher-risk for serious illness from COVID-19. INA § 241(a)(2).  For alien's [sic] subject to discretionary detention under section 236(a), please remember that release is prohibited, even if the alien is potentially higher-risk for serious illness from COVID-19, if such release would pose a danger to property or persons.  8 C.F.R. § 236.1(c)(8).

(Dkt. 33-1.)

ICE has a contract with the Sherburne County Jail ("SCJ") and the Kandiyohi County Jail ("KCJ") to house ICE detainees and provide shelter, food, and medical care. (Dkt. 33 ¶ 5.)  The Immigration Health Service Corp ("IHSC"), through Field Medical Coordinators, has provided oversight over the SCJ and the KCJ with respect to medical matters related to ICE detainees.  (Dkt. 15 ¶¶ 4-6; Dkt. 16 ¶¶ 4-6.)  During the COVID-19 pandemic, the IHSC has repeatedly provided the SCJ and KCJ with updated information from IHSC's Public Health Safety Preparedness Unit, which collaborates with the CDC and State public health agencies to track and monitor infectious diseases, to provide best practices to maximize the safety of inmates, staff, and immigration detainees.  (Dkt. 33 ¶ 7.)  ICE reviews its detained population who are a higher risk for severe disease as identified by the CDC to determine if detention remains appropriate.  (Dkt. 15 ¶ 24; Dkt. 16 ¶ 24; Dkt. 33 ¶ 8.)

**C.    Petitioners' Backgrounds**

1.    <u>Petitioner at the KCJ</u>

Petitioner Angelica C. is being held in custody at the KCJ pending removal pursuant to 8 U.S.C. § 1226(c).  (Dkt. 9 at 1 ¶ 4; Dkt. 33 ¶ 11.)  Angelica C. admits to having convictions for disorderly conduct and petty theft, as well as a misdemeanor conviction for wrongfully obtaining public assistance.  (Dkt. 9 at 1 ¶ 5.)  She claims to be suffering from a "medical condition such as diabetes."  (Dkt. 9 at 1 ¶ 16.)  It is unclear whether she claims to have diabetes or a disease similar to it.  She does specifically represent that she is suffering from depression and a cardiac ulcer.  (Dkt. 9 at 2 ¶ 16.)  In subsequent evidence supplied by Petitioner, she denies having diabetes.  (Dkt. 25-4 at 3 of 59.)

2.    <u>Petitioners at the SCJ</u>

Petitioner Maria F.D.S. has been released from custody from the SCJ on a reduced bond for unspecified reasons.  (Dkt. 33 ¶ 15.)  Respondents concede that this Petitioner is at a higher risk if she contracts COVID-19.  (Dkt. 33 ¶ 13.)

Petitioner Digna M. is being held in custody at the SCJ pending removal pursuant to 8 U.S.C. § 1226(a).  (Dkt. 9 at 18 ¶ 4; Dkt. 33 ¶ 10.)  Digna M. was denied a bond by an immigration judge as the result of being a danger to the community due to a pending identification theft charge.  (Dkt. 33 ¶ 10.)  Digna M. does not assert that he has any health factors that would place him at a severe risk related to COVID-19.

Petitioner Alejandra S. has been released from custody from the SCJ for unspecified reasons.  (Dkt. 33 ¶ 16.)

Petitioner Edgardo U. is being held in custody at the SCJ pending removal pursuant to 8 U.S.C. § 1226(a). (Dkt. 9 at 8 ¶ 4; Dkt. 33 ¶ 10.) Edgardo U. was denied a bond by an immigration judge as the result of being a danger to the community due to multiple DWIs and a pending domestic assault charge. (Dkt. 33 ¶ 10.) Edgardo U. also admits to convictions including DWI, domestic assault, and disorderly conduct, and a pending domestic assault charge. (Dkt. 9 at 8 ¶ 9.) Respondents concede that this Petitioner is at a higher risk if he contracts COVID-19. (Dkt. 34.)

Petitioner Julio G.H. is being held in custody at the SCJ pending removal pursuant to 8 U.S.C. § 1226(a). (Dkt. 9 at 18 ¶ 4; Dkt. 33 ¶ 10.) Julio G.H. did not seek a bond hearing before an immigration judge. (Dkt. 33 ¶ 10.) Julio G.H. admits to criminal convictions of driving while intoxicated and domestic assaults. (Dkt. 9 at 10 ¶ 9; Dkt. 25-7.) Julio G.H. claims to have had polio. (Dkt. 9 at 10 ¶ 9.) Julio G.H. does not have any medical conditions that place him at higher risk of COVID-19. (*See* Dkt. 25-7.)

Petitioner Stanley A. is being held in custody at the SCJ pending removal pursuant to 8 U.S.C. § 1226(a). (Dkt. 33 ¶ 10; Dkt. 9 at 8 ¶ 4.) Stanley A. was denied a bond by an immigration judge as the result of being a danger to the community as a possible human smuggler. (Dkt. 33 ¶ 10.) Stanley A. does not assert that he has any health factors that would place him at a severe risk related to COVID-19.

Yusniel M. has been released from custody from the SCJ for unspecified reasons. (Dkt. 33 ¶ 16.)

Saul M. is being held in custody at SCJ pending removal pursuant to 8 U.S.C. § 1226(a). (Dkt. 9 at 12; Dkt. 33 ¶ 10.) Saul M. was denied a bond by an immigration

judge as the result of being a danger to the community due to a pending assault charge. (Dkt. 9 at 12; Dkt. 33 ¶ 10.)  Saul M. does not assert that he has any health factors that would place him at a severe risk related to COVID-19.  That said, Saul M. has complained of recent unexplained severe stomach pain.  (Dkt. 28 ¶ 14.)

## D.    Kandiyohi County Jail

KCJ has put in place a number of modified measures to deal with the COVID-19 pandemic.  These measures include reducing the number of detainees/inmates at the KCJ. (Dkt. 32 ¶ 4.)  As of May 4, 2020, the population of the Jail was down to 109 (55 state inmates and 54 immigration detainees), which is a decrease of 81 inmates/detainees. (Dkt. 32 ¶ 4.)  Since the outbreak of the pandemic, the KCJ has worked with ICE to reduce the population of the immigration detainees and worked with the courts and the county attorney's office to release or postpone report dates of low-level offenders.  (Dkt. 32 ¶ 4.)  ICE detainees are housed in a separate long-term housing unit, which is separate and distinct from the short-term criminal inmate population, thus minimizing contact between the two groups.  (Dkt. 32 ¶ 17.)

Other measures taken by the KCJ include placing any new inmate into a quarantine that is isolated from the general population and the monitoring of these new inmates by licensed medical professionals.[2]  (Dkt. 17 ¶¶ 3, 7; Dkt. 32 ¶ 12.)  Inmates stay in quarantine until released by licensed medical staff, during which time they are seen by a licensed medical professional who conducts a general medical assessment on the

---

[2]    In addition, any existing inmate exhibiting any confirmed symptoms of illness are placed into medical isolation.  (Dkt. 17 ¶¶ 3, 7.)

inmate.  (Dkt. 17 ¶¶ 3, 15; Dkt. 32 ¶ 12.)  Inmates in quarantine are required to wear

masks.[3]  (Dkt. 32 ¶ 14.)  In the quarantine units, only one inmate/detainee or cell is

allowed in the dayroom at a time, and staff immediately clean the dayroom between

inmates/detainees.  (Dkt. 32 ¶ 14.)  When inmates are cleared by the licensed medical

staff to leave a quarantine unit to go to general population, they are assigned housing

away from the inmates that have been at the KCJ the longest as much as possible

complying with classification, space, and separation requirement issues.  (Dkt. 17 ¶ 13.)

The KCJ provides medical care through an on-site medical clinic. (Dkt. 17 ¶ 5.)

All medical staff are licensed or certified for their respective positions and includes a

nurse practitioner, a nursing director, three registered nurses, four health technicians, and

a mental health professional. (Dkt. 17 ¶ 5.)  The KCJ uses outside medical clinics if

needed for medical services that cannot be handled by its medical staff, which includes

hospital level care, specialists, and lab work.  (Dkt. 17 ¶ 5.)

The KCJ, through its administrators, asserts that it is designed to contain an

airborne threat such as COVID-19 and prevent its spread throughout the facility.  If

necessary, the KCJ can isolate itself into 2 distinct sectors or "smoke zones."  (Dkt. 17 ¶

6, Dkt. 32 ¶ 19.)  This is accomplished primarily through the Jail's separate air exchange

units, which can be set to bring in a certain percentage of fresh air while exhausting the

same amount of air from inside the KCJ.  (Dkt. 17 ¶ 6.)  Any return air passes through a

microbial filter before returning to the facility and this system can independently recycle

---

[3]     It is unclear whether masks have been provided to all inmates and detainees, or
simply to those who are being quarantined.  (*See* Dkt. 32 ¶ 13.)

up to 100% of the air within a given zone.  (Dkt. 17 ¶ 6.)

In the event COVID-19 enters the KCJ, the jail is prepared to designate entire units of the facility for isolated housing or establishing a special-housing unit for inmates that display symptoms or test positive.  (Dkt. 17 ¶ 8.)

With respect to cleaning and sanitation, the KCJ has implemented cleaning all frequently-touched surfaces in the housing units (*e.g.*, tables, handrails, doorknobs, etc.) throughout all times of the day, using a chemical formulated to kill coronaviruses.  (Dkt. 17 ¶ 10; Dkt. 32 ¶ 18.)  Additional cleaning in the housing units occurs after meals and prior to the nightly lockdown.  (Dkt. 17 ¶ 10.)  The hallway surfaces are cleaned and disinfected periodically during the day and its floors once a day.  (Dkt. 17 ¶ 10.)

Further, the KCJ issues soap free of charge to every inmate twice a week to ensure frequent hand washing.  (Dkt. 17 ¶ 11.)  Towels are also provided to every inmate and detainee free of charge, and the towels are washed every other day.  (Dkt. 32 ¶ 10.)  Further, inmates are provided sanitizing spray and cleaning rags to use to clean their cells and dayrooms.  (Dkt. 17 ¶ 11.)  Housing officers are monitoring inmate cleaning and sanitizing to ensure proper cleaning.  (Dkt. 17 ¶ 11.)

KCJ has made attempts to minimize contact both between member of the outside and between staff and inmates.  The KCJ does not allow any volunteers or visitors to enter the jail.  (Dkt. 17 ¶ 16; Dkt. 32 ¶ 20.)  The KCJ also limited its staff only to essential employees in order to limit the potential for exposure to any illness within the Jail.  (Dkt. 17 ¶ 17.)  There is now generally a staff of about 7-10 on any one shift at the KCJ.  (Dkt. 32 ¶ 5.)  As of April 7, 2020, all staff at the KCJ are required to wear face

masks when working in the housing units or when having any contact with inmates or detainees.  (Dkt. 32 ¶ 8.)  All essential employees-including the KCJ medical staff are screened on every occasion prior to the entering the Jail.  (Dkt. 17 ¶ 17.)  This screening includes a body-temperature check and any employee exhibiting any symptoms of illness are not admitted into the KCJ or onto its premises.  (Dkt. 17 ¶ 17.)  Staff are instructed to socially distance themselves from coworkers as much as their job duties allow.  (Dkt. 17 ¶ 18.)  Staff are also instructed that if they feel sick, they must stay home.  (Dkt. 32 ¶ 9.)  If staff are sick with respiratory illness of any type, they are automatically off work for a mandatory 14 days and are immediately tested for COVID-19.  (Dkt. 32 ¶ 9.)  Staff are instructed that they must report any contact they have had with anybody with COVID-19 symptoms and with anyone who has tested positive for COVID-19.  (Dkt. 32 ¶ 9.)  They are also prohibited from any unnecessary travel.  (Dkt. 32 ¶ 9.)

Using the KCJ inmate messaging system in every housing unit, inmates are instructed to socially distance themselves six feet apart and of the importance of doing so, especially as to common areas.  (Dkt. 17 ¶ 18; Dkt. 32 ¶ 11.)  In the long-term housing units, it is possible and recommended that inmates/detainees keep a 6-foot social distance from each other, and in the quarantine units, social distancing is mandated.  (Dkt. 32 ¶ 15.)  It is unclear whether inmates/detainees are single-bunked, and whether Petitioner Angelica C. is single-bunked.

With respect to meal distribution, the inmates/detainees in the quarantine units are given meals on disposable trays in their cells so the trays are thrown away when finished.  (Dkt. 32 ¶ 16.)  In the long-term housing units, inmate/detainees are given meals on

regular trays, but the inmates and detainees are allowed to take their trays to their cell so they can social distance while they eat.  (Dkt. 32 ¶ 16.)

As of April 28, 2020, the KCJ has COVID-19 test kits and the facility's on-site medical staff are now able to test symptomatic inmates and detainees on site for COVID-19, in accordance with CDC and Minnesota Department of Health testing recommendations.  (Dkt. 32 ¶ 7.)  As of May 4, 2020, there are no known cases of COVID-19 at the Jail, as no inmate, detainee, or staff member has tested positive for COVID-19.  (Dkt. 32 ¶ 6.)

**E    Sherburne County Jail**

The SCJ is a detention facility with 732 beds.  *See* Sherburne Cty. Sheriff's Office, *Jail* (last visited June 5, 2020), (https://www.co.sherburne.mn.us/400/Jail.)   The SCJ employs approximately 120 individuals.  *See id.*  Included in the inmate population are inmates under the control of Sherburne County, ICE, the United States Marshal, the Bureau of Indian Affairs, and other agencies.  *See id.*

In response to the COVID-19 pandemic, SCJ administration asked ICE to discontinue bringing in any detainees to the SCJ other than those determined by the agency to be a public safety threat.  (Dkt. 18 ¶ 7.)  In addition to reducing the intake and population of ICE detainees, the SCJ has worked with other agencies, including the U.S. Marshal's Service and local law enforcement to limit the intake of all inmates into the

facility.[4]  (Dkt. 18 ¶ 8.)  On March 16, 2020, the total SCJ population (including all inmates and detainees) was 606.  (Dkt. 18 ¶ 8.)  As of April 10, 2020, the total SCJ population was reduced to 450.  (Dkt. 18 ¶ 8.)

Like the KCJ, the SCJ has also taken additional protective measures in light of the COVID-19 pandemic.  On March 13, 2020, the SCJ implemented a quarantine process for all new arrivals (including all inmates and detainees), in which arrivals are screened before they enter the jail and prior to booking and then placed in one of 24 individual quarantine cells for 14 days.  (Dkt. 18 ¶ 10.)  During the isolation period, each inmate is monitored and screened by a licensed medical professional for signs or symptoms of illness.  (Dkt. 18 ¶ 10.)  An inmate displaying signs or symptoms of an illness is seen by a licensed medical professional and treated accordingly.  (Dkt. 18 ¶ 10.)

SCJ provides medical care through an on-site medical clinic staffed by licensed medical professionals.  (Dkt. 18 ¶ 3.)  All medical staff are licensed or certified for their respective positions.  (Dkt. 18 ¶ 3.)  SCJ also contracts with an independent medical doctor and a licensed mental health clinical counselor to do a peer review of clinic operations and review charts for patient care.  (Dkt. 18 ¶ 3.)  The SCJ medical staff includes a nurse practitioner, a nursing director, nine registered nurses, 14 health technicians, and a team of mental health professionals.  (Dkt. 18 ¶ 3.)

---

[4]    The Court notes that there are differences between the April 17, 2020 affidavit that Brian Frank submitted in this action (Dkt. 18) and the April 15, 2020 affidavit that Brian Frank submitted in *Mohammed S.*, Case No. 20-cv-793 (NEB/ECW), on April 15, 2020 (Dkt. 53).  The reason for the differences is unclear, but the Court trusts that both affidavits are accurate.

As of April 20, 2020, there were no confirmed cases of COVID-19 at the SCJ. (Dkt. 18 ¶ 4.)  One inmate was sent for COVID-19 testing, however, the test results were negative.  (Dkt. 18 ¶ 12.)

In addition, the SCJ has taken steps to minimize the risk of the virus spreading in the facility through the air.  This includes controlling the air intake and exhaust through the SCJ's nine separate air exchange units allowing it to isolate 12 distinct "smoke zones," which can be set to bring in a certain percentage of fresh air to the SCJ while exhausting the same amount of indoor air.  (Dkt. 18 ¶ 17.)  This ventilation system can exhaust and renew up to 100% of the air within a given zone.  (Dkt. 18 ¶ 17.)  The return air is passed through a MERV-8 filter before being returned to the jail.  (Dkt. 18 ¶ 17.)  While the SCJ's air exchange system is typically set at approximately 20% (meaning that 20% of the air exchanged is air from outside the Jail), the SCJ has adjusted the air exchange to 80% for all zones.  (Dkt. 18 ¶ 17.)  SCJ administration acknowledges that 100% air exchange is not possible under various weather conditions, such as when outside temperatures fall below freezing.  (Dkt. 18 ¶ 17.)

With respect to sanitizing surfaces, the SCJ cleans all frequently touched surfaces in housing units, such as tables, handrails, and door handles, four times a day with a chemical known to kill viruses.  (Dkt. 18 ¶ 18.)  Additional cleaning occurs after every meal and the nightly lockdown, the SCJ hallways are cleaned and disinfected three times per day, the floors are disinfected and cleaned once a day, and the SCJ has retained a contractor since April 7 to sanitize touch points in the SCJ, including in the housing units three times per week.  (Dkt. 18 ¶¶ 18-19.)

The SCJ administration has also made attempts to enable the SCJ population to better comply with social distancing.[5]  (Dkt. 18 ¶ 20.)  The SCJ has reduced the number of inmates allowed out of their cells at any one time to half the population, including: during meals where half the population is allowed to leave their rooms to get their meals and eat them in their cells and the other half eat in the dayroom; and otherwise only giving inmates and detainees 4 hours a day out of their cells, with a rotating schedule allowing half of the population to use the dayroom for 2 hours at a time.  (Dkt. 18 ¶ 20(b)-(d).)

---

[5]    Interim guidance provides as follows:

Although strict social distancing may not be possible in congregate settings such as detention facilities, all facilities housing ICE detainees should implement the following measures to the extent practicable:

- Efforts should be made to reduce the population to approximately 75% of capacity.
- Where detainee populations are such that such cells are available, to the extent possible, house detainees in individual rooms.
- Recommend that detainees sharing sleeping quarters sleep "head-to-foot."
- Extend recreation, law library, and meal hours and stagger detainee access to the same in order to limit the number of interactions between detainees from other housing units.
- Staff and detainees should be directed to avoid congregating in groups of 10 or more, employing social distancing strategies at all times.
- Whenever possible, all staff and detainees should maintain a distance of six feet from one another.
- If practicable, beds in housing units should be rearranged to allow for sufficient separation during sleeping hours.

*See* U.S. Imm., and Customs Enforc. ERO, *COVID-19 Pandemic Response Requirements* (last visited June 5, 2020), https://www.ice.gov/doclib/coronavirus/ eroCOVID19responseReqsCleanFacilities.pdf.

Changes have also been made to internal delivery systems to minimize person-to-person contact. (Dkt. 18 ¶ 23.) This includes delivery of commissary items and laundry to inmates in their individual cells after the pod locks down for the evening, and the use of legal carts is limited to when inmates are otherwise allowed to be out of their cells in the dayroom. (Dkt. 18 ¶ 23.)

Delivery of medications is done in the main hallway of a unit using a pass-through in a door. (Dkt. 18 ¶ 23(c).) Medical staff observes the inmate through a window in the door. (Dkt. 18 ¶ 23(c).) Medical staff have been required to wear a mask and a face shield or goggles while delivering medications since April 5, 2020. (Dkt. 18 ¶ 23(c).)

The SCJ administration has also implemented changes to staff procedures to limit the chances of contamination or cross-contamination. Since April 6, 2020, the SCJ has altered scheduling of staff to 12-hour shifts with seven days on and seven days off. (Dkt. 18 ¶ 24(a).) According to SCJ administration, the seven-day-off period allows staff to self-quarantine and monitor for any signs of illness. (Dkt. 18 ¶ 24(a).) If any signs of illness are reported, an additional quarantine period is initiated. (Dkt. 18 ¶ 24(a).) All SCJ staff are screened and have their temperature taken when they arrive to work each day. (Dkt. 18 ¶ 24(b).) If any staff member has a temperature above 99.5 degrees Fahrenheit, the staff member is sent home and Minnesota Department of Health guidelines are followed before the person is allowed to return to work. (Dkt. 18 ¶ 24(b).)

Further, staff no longer receive face-to-face briefings, and staff is assigned to a single zone for their entire seven-day work period. (Dkt. 18 ¶ 24(c)-(d).) Separate break areas have been provided for staff in each zone and staff are instructed to maintain social

distancing, and with the exception of designated "rovers," staff are generally required to stay within their zone except if needed to respond to emergencies. (Dkt. 18 ¶ 28(d).)

As of April 6, 2020, staff have been instructed to wear cotton masks while inmates are out of their cells. (Dkt. 18 ¶ 24(e)-(f).)

## F.   Motion for Temporary Restraining Order and Preliminary Injunction

Petitioners move the Court pursuant to Federal Rule of Civil Procedure 65(a) and (b) for a TRO or, in the alternative, for a preliminary injunction, requiring the Respondents to release them from their present detention or to provide them with a bail hearing.[6]  The legal basis for the relief is that without release Respondents are depriving Petitioners of their rights to substantive due process by failing to provide for their health and safety and are subjecting them to unlawful punishment in violation of the Constitution. (Dkt. 6 at 11-14.)

## II.   LEGAL STANDARD

## A.   Habeas Corpus

 "Writs of habeas corpus may be granted by the Supreme Court, . . . the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). The writ of habeas corpus under Section 2241 shall not extend to an individual unless

---

[6]     The Court notes that Petitioners also seek an order for a stay precluding Respondents from moving them during the pendency of this action. (Dkt. 6 at 14.)  The Court interprets this request as seeking an order enjoining their removal from the United States.  To the extent that there are orders for removal as to Petitioners, the Eighth Circuit and not this Court has the requisite subject-matter jurisdiction to entertain such a request for relief. *See Hillary K. v. DHS-ICE,* No. 19-CV-2965 (PJS/KMM), 2020 WL 1922570, at *3 (D. Minn. Apr. 21, 2020) (citations omitted).

"[h]e is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2241(c)(3). On habeas review, "this Court may decide whether [a detainee's] continued detention violates his constitutional due process rights." *Mohamed v. Sec'y Dep't of Homeland Sec.*, 376 F. Supp. 3d 950, 954 (D. Minn. 2018) (citation omitted). Moreover, "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus." *Muhammad v. Close,* 540 U.S. 749, 750 (2004) (citation omitted).

The Court agrees with Respondents that the Court does not have jurisdiction to grant class-wide injunctive relief, as 8 U.S.C. § 1252(f)(1) unambiguously precludes this Court from granting class-wide injunctive relief that would effectively restrain operation of §§ 1221-31. This provision, titled, "Limit on injunctive relief," states:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221-1231] other than with respect to the application of such provision **to an individual** against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1) (emphasis added).

Therefore, while section 1252(f)(1) does not preclude individual claims, which the Court finds present Motion addresses, it bars injunctive relief on behalf of a class and any such request for relief by Petitioners (Dkt. 25 at 30) should be denied. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018).

Respondents also argue that the habeas proceeding embodied by the Petition is improper in this case as Petitioners are challenging the conditions of their confinement

given that their release is predicated on the conditions within KCJ and SCJ in light of COVID-19.  (Dkt. 14 at 14-15.)  The United States Supreme Court has "left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal.").  That said, the Eighth Circuit, in post-*Preiser* decisions, addressing a split in decisions among the Circuits, has concluded that a habeas petition is not the proper claim to remedy constitutional claims relating to the conditions of confinement.  *Spencer v. Haynes*, 774 F.3d 467, 470-71 (8th Cir. 2014) (citing *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996)).

    *Spencer* and *Kruger* are distinguishable from the unique and unprecedented dilemma that the COVID-19 pandemic presents.  Indeed, in *Spencer*, the Eighth Circuit in making its holding noted that Spencer was not "seek[ing] a remedy that would result in an earlier release from prison."  774 F.3d at 469.  Instead, his Eighth Amendment challenge pertained to the use of four-point restraints on his person for an extended

period of time.[7]  *Id.*  Under such a claim, Spencer could have arguably brought an action

under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S.

388 (1971), to challenge the violation.  Indeed, the Eighth Circuit in *Spencer* found that

the district court should have given Spencer the option of converting his habeas petition

into a *Bivens* claim.  *Id.* at 471.  Here, however, the remedy being sought by Petitioners is

release as means to protect themselves from possible death.  Release is not a remedy

allowed for under a civil rights action.  *See Preiser*, 411 U.S. at 500.

   To the extent that the conditions of confinement create a due process violation that

cannot be remedied and for which death is a probability, this Court finds that it has the

subject matter jurisdiction to entertain a habeas petition under Section 2241 for the

release of Petitioners.  *See Mohammed S.*, 2020 WL 2750109, at *2 ("In such situations,

where the relief requested is release, and the argument is that confinement itself is

unconstitutional, this Court agrees that it has the authority to release individuals from

custody through a § 2241 petition.").  This is consistent with the plain language of

Section 2241, which provides that writ of habeas corpus under Section 2241 shall not

extend to an individual unless "[h]e **is in custody in violation of the Constitution** or

laws or treaties of the United States."  28 U.S.C. § 2241(c)(3) (emphasis added); *see also*

*Muhammad*, 540 U.S. at 750 ("Challenges to the validity of any confinement or to

particulars affecting its duration are the province of habeas corpus . . . .") (citation

---

[7]      In *Kruger* the claimant filed a petition of habeas corpus in federal district court on
the ground that by taking his blood sample, his constitutional rights had been violated.
*See Kruger*, 77 F.3d at 1073.

omitted); *Awshana v. Adducci*, No. 20-10699, --- F. Supp. 3d. ----, 2020 WL 1808906, at *2 (E.D. Mich. Apr. 9, 2020) ("The petitioners here, however, are not seeking to change the conditions of their confinement or to obtain damages for past constitutional violations. Instead, they describe the close living conditions typical of custodial confinement, they recount the current commands for social distancing necessary to inhibit the spread of the novel coronavirus, and they argue that no custodial condition will protect them from infection . . . . That form of relief falls squarely within the prevue of section 2241."); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) (noting that the Sixth Circuit does not allow habeas petition pertaining to conditions of confinement, and finding "[o]n its face, the application appears to concern Petitioner's conditions of confinement. Petitioner titles her claim for relief: 'Freedom from Cruel Treatment and Conditions of Confinement.' But Petitioner may nonetheless bring her claim under 28 U.S.C. § 2241 because she seeks immediate release from confinement as a result of there being no conditions of confinement sufficient to prevent irreparable constitutional injury under the facts of her case.").

For all of these reasons, the Court finds that it has the requisite jurisdiction to consider Petitioners' habeas petition for injunctive relief as it relates to their individual release from KCJ or SCJ in light of COVID-19.[8]

---

[8]    The Court notes that Petitioners have asserted an alternative ground for jurisdiction—a cause of action under 28 U.S.C. § 1331, which Respondents do not contest. (Dkt. 1 ¶ 19.) Other courts addressing similar petitions have recognized § 1331

**B.    Motion for TRO or Preliminary Injunction**

Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of either a TRO or a preliminary injunction.  To determine if a party is entitled to a TRO, a court considers: (1) the likelihood of success on the merits of the claimant's claims; (2) the threat of irreparable harm to claimant; (3) the balance between that threat of harm and the injury that granting injunctive relief would inflict on other interested parties; and (4) whether the issuance of a TRO is in the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  The same factors are considered for a motion for preliminary injunctive relief.  *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 709 (8th Cir. 1989); *Jackson v. Nat'l Football League*, 802 F. Supp. 226, 229 (D. Minn. 1992).  "When a defendant has received notice and had an opportunity to respond to a motion for a TRO, the motion will be construed as one for a preliminary injunction."  *Stabnow v. Lourey*, No. 19-CV-1664 (NEB/HB), 2019 WL 5150155, at *1 (D. Minn. July 23, 2019), *R.&R.*

---

as a valid basis for jurisdiction. *Mohammed S.*, 2020 WL 2750109, at *2 n.5 (citing *Urdaneta v. Keeton*, No. CV2000654PHXSPLJFM, 2020 WL 2319980, at *7 (D. Ariz. May 11, 2020) ("Even if the Court were to lack jurisdiction to review Petitioners' claims under § 2241, Petitioners have alternatively pleaded a cause of action under the Fifth Amendment for injunctive and declaratory relief, over which the Court would have jurisdiction under 28 U.S.C. § 1331, as an equitable cause of action under the Constitution."); *Malam*, 2020 WL 1672662, at *4 ("Should Petitioner's habeas petition fail on jurisdictional grounds, the Fifth Amendment provides Petitioner with an implied cause of action, and accordingly 28 U.S.C. 1331 would vest the Court with jurisdiction.")).

*adopted sub nom.* 2019 WL 4201071 (D. Minn. Sept. 5, 2019) (citing *Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1052 n.1 (D. Minn. 2013)).

No single factor is determinative, and all factors must be viewed in totality when a court decides if relief should be granted. *Dataphase Sys.*, 640 F.2d at 113. Because "a preliminary injunction is an extraordinary and drastic remedy, one [ ] should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and emphasis omitted); *Mgmt. Registry, Inc. v. A.W. Co., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) ("The party seeking injunctive relief bears the burden of proving these factors weigh in its favor.") (quotation marks and citation omitted).

### III. <u>ANALYSIS</u>

#### A. **Irreparable Harm**

"The threshold inquiry is whether the movant has shown the threat of irreparable injury." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). If "a court determines that the movant has failed to show irreparable harm absent an injunction, the inquiry is finished and the denial of the injunctive request is warranted." *Id.* at 420 (citations omitted). "The failure to demonstrate irreparable harm is an independently sufficient ground to deny injunctive relief." *Jackson v. Macalester Coll.*, 169 F. Supp. 3d. 918, 921 (D. Minn. 2016) (citing *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). This is because "'[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" *Gelco Corp.*, 811 F.2d at 418

27

(quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)) (internal quotation marks and citations omitted).

"The harm must be likely in the absence of an injunction, great, and of such imminence that there is a clear and present need for equitable relief." *Cambria Co. LLC v. Schumann*, No. 19-CV-3145 (NEB/TNL), 2020 WL 373599, at *7 (D. Minn. Jan. 23, 2020) (quoting *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1055 (D. Minn. 2019)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."). A claimant "must show more than a future risk of irreparable harm; 'there must be a clear showing of immediate irreparable injury.'" *Cambria*, 2020 WL 373599, at *7 (quoting *Berkley Risk Admins. Co., LLC v. Accident Fund Holdings, Inc.*, No. 16-CV-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016)) (cleaned up); *see also Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996) ("In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."). "Possible or speculative harm is not sufficient." *Anytime Fitness, Inc. v. Family Fitness of Royal*, LLC, No. 09-cv-3503 (DSD/JSM), 2010 WL 145259, at *2 (D. Minn. Jan. 8, 2010) (citing *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir.1995)). Indeed, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . [the] characterization of injunctive relief as an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

Petitioners assert that they have met the irreparable harm element, given the harm that COVID-19 poses. (Dkt. 25 at 25-26.) There is no dispute that there have been no confirmed cases of COVID-19 within either the KCJ or the SCJ. This alone reduces the imminence of Petitioners' claims of irreparable harm, especially considering the measures put in place by the facilities in which they have been placed by Respondents, regardless of the Petitioners' possible susceptibility to the disease. *See Brown v. United States Dep't, of Homeland Sec.*, No. 3:20-CV-0119, 2020 WL 1911506, at *8 (M.D. Pa. Apr. 20, 2020) ("While, the Court acknowledges Brown's susceptibility to complications should he contract COVID-19, the Court, again, notes that Brown is housed in a facility with no confirmed cases of COVID-19. Thus, that alone, reduces the imminence of Brown's claim."). Further, the Court cannot disregard the extensive cleaning, sanitation, and social distancing procedures implemented by the KCJ and the SCJ to minimize the risks relating to COVID-19. *See Albino-Martinez v. Adducci*, No. 2:20-CV-10893, --- F. Supp. 3d ----, 2020 WL 1872362, at *4 (E.D. Mich. Apr. 14, 2020) ("And, although there are confirmed COVID-19 cases in St. Clair detention facility, there is no evidence that Respondents and facility officials are not doing everything possible to prevent the spread of COVID-19 and to keep detainees safe. Both the Monroe and the St. Clair detention facilities have instituted policies specifically designed to combat COVID-19 and care for detainees. Petitioners therefore failed to meet their burden to demonstrate that they would face an immediate and irreparable injury absent the Court granting their motion.")

(internal citations omitted).  While the measures KCJ has implemented may not be as stringent as those implemented by SCJ, the Court notes that the sole Petitioner held at KCJ, Angelica C., does not appear to be high risk based on the record and the fact that she has denied having diabetes.  (*See* Dkt. 9 at 1 ¶ 16; Dkt. 25-4 at 3 of 59.)

In addition, at this stage in the proceedings, Petitioners have not provided the Court with any proposed concrete release plan demonstrating (including representations from third parties stating that they will accept them into their residences) that they will isolate if released or that they will be safer if they do have a residence in which to isolate. There is no dispute that "[e]very person in the United States, whether in a detention facility or not, faces COVID-19 exposure."  *Albino-Martinez*, 2020 WL 1872362, at *4. Therefore, Petitioners have failed to show they are more likely than not to suffer imminent and irreparable harm if they remain in detention.  *See Brown*, 2020 WL 1911506, at *8.

For all of the reasons stated forth above, Petitioners have failed to meet their burden to show an irreparable harm.[9]

**B.    Likelihood of Success on the Merits**

While no single *Dataphase* factor is determinative, "[s]uccess on the merits has been referred to as the most important of the four factors."  *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citation omitted); *see also Mid-Am. Real*

---

[9]    The Court also notes that to the extent that a Petitioner has been removed from the SCJ, there is no arguable basis for irreparable harm and the request for injunctive relief appears to be moot.  *See Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005).

*Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005) ("[A]n injunction cannot

issue if there is no chance of success on the merits.") (citations omitted). "In considering

the likelihood of the movant prevailing on the merits, a court does not decide whether the

movant will ultimately win." *PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143

(8th Cir. 2007) (citation omitted). Instead, this factor simply requires a movant to show

that he has a "fair chance of prevailing" on its claims. *See Planned Parenthood Minn.,

N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).

Petitioners' habeas petition and motion for injunctive relief raise two separate

grounds for habeas relief. First, they argue Respondents have violated their substantive

due process rights by demonstrating deliberate indifference to their serious medical needs

and safety given the COVID-19 pandemic. (Dkt. 6 at 12; Dkt. 25 at 15.) Second,

Petitioners argue the conditions of their confinement in light of the dangers of COVID-19

amounts to unlawful punishment in violation of due process.[10] (Dkt. 6 at 11-12; Dkt. 25

at 15.)

---

[10]    Petitioners also raise for the first time in their Reply Memorandum a claim
asserting that Respondents denied them as persons with disabilities the benefits of
Executive Agency programs and activities, in violation of Section 504 of the
Rehabilitation Act. (Dkt. 25 at 15, 23-25.) The Court rejects this argument on the basis
that the underlying Petition and initial memorandum do not assert such a claim. *See
Smith v. United States*, 256 F. App'x 850, 852 (8th Cir. 2007) ("[T]he district court did
not err in dismissing claims raised for the first time in a . . . reply brief"); *Navarijo-
Barrios v. Ashcroft*, 322 F.3d 561, 564 n.1 (8th Cir. 2003) ("It is well settled that we do
not consider arguments raised for the first time in a reply brief."); *Hohn v. United States*,
193 F.3d 921, 924 (8th Cir. 1999) ("We decline to address Hohn's claim that he can
demonstrate cause and prejudice for his default, because he asserts this for the first time
in his reply brief."). Regardless, even assuming that Petitioners are disabled, they are not
likely to prevail on their Rehabilitation Act claim, as it does not require the Respondents

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) (citation omitted). This "affirmative duty to protect" arises by the limitation the state has imposed on a person's freedom to act on his own behalf. *Id*. at 200. As immigration detainees, Petitioners' status is similar to the status of pretrial detainees. *See Ukofia v. Dep't of Homeland Sec.*, No. CIV. 09-0017PJS/JJG, 2010 WL 597059, at *6 (D. Minn. Feb. 17, 2010) (citations omitted) ("The status of an immigration detainee is similar to the status of a pretrial detainee."); *see also Alejandra*, 2020 WL 1703844, at *6. In addition, detainees "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell*, 441 U.S. at 535 (citations omitted); *see also Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982) (finding that individuals who have been civilly detained or committed "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish"). That said, "not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (citation omitted).

The Eighth Circuit has held that "deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial

---

to give disabled inmates preferential treatment. *See Lue v. Moor*e, 43 F.3d 1203, 1205-06 (8th Cir. 1994).

detainees with adequate food, clothing, shelter, medical care, and reasonable safety."[11] *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). Similarly, the Eighth Circuit in *Butler* concluded that the deliberate indifference test, not the freedom from punishment test, applies to a claim challenging the adequacy of precautionary measures to reduce the risk of infection. "The governmental duty to protect at issue in this case is not based on a pretrial detainee's right to be free from punishment but is grounded in principles of safety and general well-being." 465 F.3d at 344.[12]

"To show deliberate indifference, the prisoner/detainee must prove both that the official's acts objectively caused a sufficiently serious deprivation and that the official had a subjectively culpable state of mind." *Perkins v. Grimes*, 161 F.3d 1127, 1130 (8th Cir. 1998) (citation omitted); *see also Coreas v. Bounds*, No. CV TDC-20-0780, 2020

---

[11]    The Court notes that while the Petition is technically not analyzed under the Eighth Amendment, but under the Due Process Clause, there is no practical difference in the analysis since pretrial detainees are entitled to the same protection under the Fifth and Fourteenth Amendments as imprisoned convicts receive under the Eighth Amendment. *See City of Revere*, 463 U.S. 239, 244 (1983); *Butler*, 465 F.3d at 345; *Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003); *Davis v. Hall*, 992 F.2d 151, 152-53 (8th Cir. 1993) (identifying standard for Eighth Amendment claim of deliberate indifference, then applying it under the Fourteenth Amendment to claim by pretrial detainee).

[12]    Petitioners' reliance on *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004) and *Fraihat v. U.S. Immigration & Customs Enf't*, No. EDCV191546JGBSHKX, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020) (Dkt. 25 at 22), ignores the fact that such courts use a different test, looking at whether a condition of confinement serves an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose, or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, *e.g.*, *Jones*, 393 F.3d at 932 (quotation marks and citations omitted), as opposed to the deliberate indifference test used under Eighth Circuit jurisprudence for the purposes of evaluating an unlawful punishment claim with respect to the health and safety of pretrial detainees, *see Butler*, 465 F.3d at 344-45.

WL 1663133, at *9 (D. Md. Apr. 3, 2020) (applying this criteria to analysis of immigration detainee with respect to a deliberate indifference claim in the COVID-19 context).  The objective prong requires that Petitioners show that they suffered from an objectively serious medical need.  *See Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016).  With respect to the objective factor, Petitioners must show that they themselves individually are being exposed to an unreasonably dangerous situation where it is likely they will contract the COVID-19 and are at risk for serious complications as it relates to the infection, and need to produce "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood [of] injury."  *See Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Malam*, 2020 WL 1672662, at *11 ("The objective component is satisfied by showing that, absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm.") (quotation marks and citation omitted).  Such showing can be made through medical evidence or is so obvious that a lay person would recognize the danger.  *See Saylor*, 812 F.3d at 644.  With respect to the objective prong, the available evidence establishes that COVID-19 is a highly communicable disease that presents a potentially mortal risk, particularly for high-risk individuals such as those Petitioners with risk factors identified by the CDC. Respondents argue that officials are not objectively indifferent to Petitioners' medical needs or the seriousness of the COVID-19 pandemic.  (Dkt. 14 at 18-19.)  Respondents appear to conflate the objective and subjective elements of the deliberate indifference test.  As set forth above, the CDC recognizes that detention centers present unique challenges for the control of COVID-19 and ICE, though the ERO has acknowledged this

unique threat by issuing COVID-19 Pandemic Response Requirement and updating its internal guidance related to release.  In other words, it is hard for Respondents to argue that there is no objective harm to Petitioners based on the threat that COVID-19 poses to detainees (as well as the public as whole) given the steps they have taken to prevent harm within detention centers, and a "remedy for unsafe conditions need not await a tragic event."  *Helling*, 509 U.S. at 33-34; *Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995) (finding that a government actor can violate the Constitution "by being deliberately indifferent either to a prisoner's existing serious medical needs or to conditions posing a substantial risk of serious future harm").

As it relates to the subjective prong, a "prisoner/detainee must prove that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that the official drew that inference."  *Perkins*, 161 F.3d at 1130 (citation omitted).  "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence," requiring a "mental state akin to criminal recklessness."  *Saylor*, 812 F.3d at 644 (citations and quotations omitted); *see also Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (citations and quotations omitted) ("To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the arrestee's health.") (cleaned up).  Moreover, deliberate indifference must be more than simply a disagreement regarding medical judgment or with treatment decisions.  *See Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) (citing *Estate of Rosenberg v. Crandell*, 56

35

F.3d 35, 37 (8th Cir. 1995)).  Indeed, where "proscriptive action designed to alleviate the medical need has been provided and the dispute is over the adequacy of the treatment or preventative steps taken, federal courts 'are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'"  *Jorge V.S. v. Green.*, No. CV 20-3675 (SDW), 2020 WL 1921936, at *3 (D.N.J. Apr. 21, 2020) (quoting *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013), quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).  Further, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

While the medical conditions of the Petitioners are relevant, the fact that a detainee falls into one of the CDC's risk groups does not amount to a *de facto* constitutional violation by Respondents for failure to release such a detainee.  Even assuming the risk to those detainees with medical conditions renders them more susceptible to serious COVID-19 infections, under CDC and ICE guidance, Respondents in conjunction with those in charge of the KCJ and the SCJ have taken numerous measures in order to prevent the spread of COVID-19 in these detention facilities, and thereby reduce the likelihood that the detainees, including those at higher risk, become infected by the virus.  Again, the Court notes that the sole Petitioner detained at KCJ, Angelica C., does not have a medical condition that increases her risk from COVID-19.

In this case, both Respondents have acknowledged the risk of spread of COVID-19 in SCJ.  In accepting this risk, Respondents have worked together with the KCJ and

36

the SCJ to put in place numerous procedures meant to prevent the introduction of COVID-19 at the SCJ and its spread to Petitioners.  This includes aggressive measures to decrease the risk of the introduction of the virus into the KCJ and SCJ based on decreasing their respective populations, and their quarantine procedures for new inmates/detainees, and their staffing procedures.  Further, the KCJ and SCJ have taken steps to prevent the spread of the virus within their facilities.  This includes increasing the renewal of the Jails' air with fresh air and filtering the return air; frequent sanitization; giving Petitioners access to no cost hand-washing; and providing staff with masks.

For the purposes of finding a likelihood of success as to deliberate indifference, the Court cannot find based on this record that Respondents' conduct is akin to criminal recklessness for refusing to release them simply because Respondents cannot guarantee that the infection will not enter or spread within the KCJ or SCJ.  *See Brown*, 2020 WL 1911506, at *7-8 (finding that although petitioner had medical conditions placing him at serious risk of COVID-19, the measures taken by respondent, which were less than the Respondents in this case, "do not demonstrate that prison officials have recklessly disregarded the substantial risk of harm that COVID-19 poses.  Rather, these actions indicate that Respondent is actively taking significant steps to try and prevent detainees from contracting COVID-19.  While there may not yet be a perfect solution to preventing the spread of this infectious disease, Respondent's conduct simply does not demonstrate a deliberate indifference to the current global pandemic.").  Indeed, Petitioners cannot guarantee that they will not contract the disease should they be released.  *See Hassoun v. Searls*, No. 1:19-CV-00370 EAW, ---F. Supp. 3d ----, 2020 WL 1819670, at *7

(W.D.N.Y. Apr. 10, 2020) ("The fact that Respondent has not been able to eliminate the risk entirely does not establish deliberate indifference—to the contrary, despite unprecedented efforts by all levels of government, the public as a whole remains at risk of contracting COVID-19.").

Moreover, Petitioners' position that Respondents are acting with deliberate indifference, despite all of their attempts and procedures put in place in conjunction with the Jails to keep the virus out of the KCJ and the SCJ and to prevent its spread within Jails because the best way to prevent them from contracting the virus is their release, is contrary to the Eighth Circuit's decision in *Butler* dealing with the spread of tuberculous[13], another airborne communicable disease, to detainees:

> In this case, Butler challenged health care policies adopted and implemented by the County. Those policies did not disregard the risk of tuberculosis infection at ADC. To the contrary, as the district court noted, the policies specifically acknowledged the risk and promulgated detailed procedures for the diagnosis, segregation, and treatment of ADC inmates infected with active cases of TB. Butler asserted—with virtually no supporting evidence—that the above-described initial screening procedures were not implemented at ADC. Even if true, that would be evidence that certain ADC staff negligently, or even deliberately, failed to implement lawful policies. It is not evidence that the policies themselves were unconstitutional. Thus, the district court properly dismissed this official capacity claim because the undisputed evidence demonstrated that the County implemented policies addressing the serious health risk that TB poses to ADC detainees. Sheriff Fletcher did not act with deliberate indifference to this risk of harm, **whether**

---

[13]    "TB bacteria are spread through the air from one person to another. The TB bacteria are put into the air when a person with TB disease of the lungs or throat coughs, speaks, or sings. People nearby may breathe in these bacteria and become infected." CDC, *How TB Spreads*, (lasted visited April 27, 2020), https://www.cdc.gov/tb/topic/basics/howtbspreads.htm. The Court recognizes that there are differences in the manner in which and extent to which TB and COVID-19 spread; nevertheless, *Butler* sets forth the law this Court is required to apply.

**or not he might arguably have taken other "reasonable measures to abate it**."

*Butler*, 465 F.3d at 345-46 (emphasis added).  Petitioners argue that while Respondents took some available measures to mitigate the threat of COVID-19, there is a serious question whether the issuance of non-binding recommendations is an objectively "reasonable" response to a pandemic, given the high degree of risk and obvious consequences of inaction, which should result in their prompt prelease.  (Dkt. 25 at 19-20.)  The Court recognizes that Respondents' measures may indeed prove inadequate to prevent COVID-19 from entering or spreading within KCJ and SCJ, and that in fact there may not be a perfect solution to prevent COVID-19 from doing so.  But the Constitution does not mandate a perfect solution to avoid a deliberate indifference claim.  In other words, the significant steps Respondents have taken to prevent the introduction and spread of COVID-19 do not amount to deliberate indifference merely because Respondents will not take the alternative measure of releasing the Petitioners, especially where there is no indication that COVID-19 is presently within the facilities or that Petitioners will not nevertheless contract the disease outside the facilities, especially in light of the fact of the recent relaxing of stay at home orders, including in Minnesota.[14] See *Leandro R. P., v. Decker*, 2020 WL 1899791, at *8 (D.N.J. Apr. 17, 2020) ("[A]ctions indicate that Respondents are actively taking significant steps to try and

---

[14]     *See, e.g.*, State of MN, *Emergency Executive Order 20-56 Safely Reopening Minnesota's Economy and Ensuring Safe Non-Work Activities during the COVID-19 Peacetime Emergency* (last visited June 5, 2020) https://mn.gov/governor/assets/ EO%2020-56%20Final_tcm1055-431921.pdf.

prevent detainees from contracting COVID-19.  While there may not yet be a perfect solution to preventing the spread of this infectious disease, Respondents['] conduct simply does not demonstrate a deliberate indifference to the current global pandemic."); *Verma v. Doll*, No. 4:20-CV-14, 2020 WL 1814149, at *6 (M.D. Pa. Apr. 9, 2020) ("There is no perfect solution to preventing the spread of COVID-19 in detention facilities, but York County Prison officials have taken reasonable steps to limit the spread throughout its facility.  Verma has not established a conscious disregard for the risk posed by COVID-19.  Respondent's conduct does not constitute deliberate indifference.") (internal citation omitted); *Sacal-Micha v. Longoria*, 1:20-CV-37, ---F. Supp. 3d----, 2020 WL 1518861, at *5-6 (S.D. Tex. Mar. 27, 2020) (dealing with vulnerable individual based on medical conditions and age and finding that "the record reflects that ICE has provided constant medical attention . . . and has implemented preventative measures to reduce the risk of Sacal contracting COVID-19.  Those measures may ultimately prove insufficient.  But the implementation of those measures preclude a finding that ICE has refused to care for Sacal or otherwise exhibited wanton disregard for his serious medical needs.  In other words, Sacal has not demonstrated that the conditions in which ICE maintains him in custody arise to the level of a constitutional violation" and concluding that "the fact that ICE may be unable to implement the measures that would be required to fully guarantee Sacal's safety does not amount to a violation of his constitutional rights and does not warrant his release."); *see generally*, *United States v. Graham*, No. 19-CR-1852 (SRN-KMM), ---- F. Supp. 3d ----, 2020 WL 1685912, at *6 (D. Minn. Apr. 7, 2020) (citations omitted) (dealing with the SCJ and finding that because there was "no

evidence that the Jail is unable to effectively monitor or treat him should he contract COVID-19, along with a lack of evidence showing that Graham is at higher risk of contracting COVID-19 in general, or a higher risk while in custody than if he were released, the Court finds no evidence of deliberate indifference to his medical needs in violation of the Eighth Amendment").  Further, this is not a situation where the Jails that Respondents are relying upon to care for those in their custody are attempting to hide or cover up the existence of the virus in their facilities given that they have recently acquired at least some test kits in an environment where testing, even as to the public as whole, is not widely available.  *See Mohammed S.*, 2020 WL 2750109, at *3 ("The final issue meriting further comment is Petitioners' objection to the R&R based on their assertion that the SCJ has made a 'deliberate decision not to test inmates or staff for COVID-19.'  As the SCJ makes clear, testing supplies are limited everywhere, the SJC has followed the Minnesota Department of Health ('MDH') guidelines for testing, and these guidelines are influenced by national shortages of testing supplies.  Moreover, the SJC notes that Minnesota's testing capacity is increasing, and that the SJC has received additional tests; the SJC attests that it will continue to follow MDH guidelines on testing. On this record, there is no evidence that the SCJ is ignoring any known health risk.") (internal citations omitted); Dkt. 32 ¶ 7 (stating that as of April 28, 2020, the KCJ has COVID-19 test kits and the facility's on-site medical staff are now able to test symptomatic inmates and detainees on site for COVID- 19, in accordance with CDC and Minnesota Department of Health testing recommendations).

In sum, on this record, Petitioners have not demonstrated sufficient likelihood of success in proving that Respondents have acted with deliberate indifference to their medical care and reasonable safety or engaged in unlawful punishment for the purposes of their due process claims.

## C.     Balance of Harms and Public Interest

When a party seeks preliminary injunctive relief against the government, the balance of the equities and the public interest factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting, in the context of a plaintiff's suit seeking a stay of removal proceedings, that the balance of equities and public interest "factors merge when the Government is the opposing party").  In the detention setting, a request for a preliminary injunction "must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration."  *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (internal quotation marks omitted).

The public interest in enforcement of United States immigration laws is significant.  *See United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *see also Nken*, 556 U.S. at 436 ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permit[s] and prolong[s] a continuing violation of United States law.") (internal marks omitted).  However, "the determination of where the public interest lies also is dependent on the determination of the likelihood of success on the merits of the [constitutional] challenge because it is

always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc).

In addition, although Petitioners have a legitimate concern regarding their health resulting from the threat of COVID-19, as set forth with respect to the irreparable harm, it is not clear to the Court based on the existing record that Petitioners will be able to effectively isolate if released, or deal with their existing medical health issues, including mental health issues. *See Lopez-Marroquin v. Barr*, No. 20CV682-LAB (MDD), 2020 WL 1905341, at *6 (S.D. Cal. Apr. 17, 2020) ("Petitioner even acknowledges that doctors have told him he needs medication, but he does not understand the purpose and impact of his medication, and he cannot reliably administer his own mental health care. Therefore, unlike in other cases where courts have found that a petitioner would be better able to protect themselves from COVID-19 in their own homes, the Court finds that Petitioner's health would be better protected in detention than outside of it.") (internal citations omitted).

Because this Court has determined that Petitioners are unlikely to succeed on the merits with respect to their constitutional claims, coupled with the other policy considerations discussed above with respect to deferring to prison officials in matters of prison administration, immigration enforcement, the health of Petitioners, and the health

43

and safety of the public,[15] this Court finds based on the available record that the public interest and the balance of harms would not be served by granting Petitioners' Motion. This factor, therefore, also weighs against entry of a preliminary injunction.

* * *

Having considered the *Dataphase* factors, the Court finds they weigh against granting a TRO or preliminary injunction, and therefore recommends denial of the Motion. Similarly, Petitioners' request for a bail hearing should be denied. However, the Court does share Petitioners' concerns regarding the risk that COVID-19 presents to them during their detention at the KCJ or the SCJ. What is known and understood about the COVID-19 pandemic, as well as the conditions within the KCJ and SCJ, is still evolving, that there may be subsequent facts established as to those conditions and an individual Petitioner's health and proposed release plan that could require a different result. For those reasons, the Court recommends denying the Motion without prejudice.

---

[15]    The Court notes that the only Petitioner with documented CDC risk factors related to COVID-19, Edgardo U., has admitted to convictions including domestic assault and disorderly conduct, and a pending domestic assault charge. (Dkt. 9 at 8 ¶ 9.)

## IV.    **RECOMMENDATION**

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**RECOMMENDED** that the Motion for Temporary Restraining Order or Preliminary

Injunction (Dkt. 4) be **DENIED without prejudice**.

DATED: June 5, 2020                          *s/ Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Consistent with District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations on or before **June 12, 2020**. A party may respond to those objections on or before **June 19, 2020**.  D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).